UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

JEFFREY MARK OLSON, on his own behalf    )
and on behalf of a class of those similarly    )
situated,                                      )
                                               )
      Plaintiffs,                          )
                                               )
             v.                  )        Case No. 4:09-CV-6 JD
                                               )
TRACY BROWN, in his official capacity as       )
Sheriff of Tippecanoe County,                  )
                                               )
      Defendant.                           )

OPINION AND ORDER

      This matter is before the Court on a Motion for Class Certification filed by counsel for

the Plaintiff Jeffrey Mark Olson ("Mr. Olson") [DE 2, as supplemented at DE 60, DE 67].  Also

pending is a Rule 12(c) Motion for Judgment on the Pleadings  filed by counsel for the

Defendant Tracy Brown, Sheriff of Tippecanoe County ("Sheriff Brown") [DE 19, as

supplemented at DE 61].[1]

      Sheriff Brown supports the Court's ruling on the Motion for Judgment on the Pleadings

before ruling on the Motion for Class Certification, while Mr. Olson would have it the other way

around, or would support simultaneous rulings.  However, the Court has resolved to determine,

first, whether class certification is proper, and second, whether a judgment on the pleadings is

proper, consistent with the directives of the United States Supreme Court and the Seventh

Circuit. *See Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 177 (1974); *Thomas v. City of Peoria,*

_____

[1]Although this case was characterized on appeal as a Motion to Dismiss, *Olson v. Brown*, 594
F.3d 577, 584 (7th Cir. 2010), the parties' supplemental briefs confirm that the motion is in fact one for
judgment on the pleadings.

580 F.3d 633, 635 (7th Cir. 2009) ("First ruling on the merits of the federal claims, and then denying class certification on the basis of that ruling, puts the cart before the horse.") (collecting cases). Employing this process further comports with the Seventh Circuit's conclusion that "this case would be moot if Olson had brought his claims individually . . . [because he] sought injunctive relief and is no longer subject to the conditions that formed the basis of his complaint." *Olson v. Brown*, 594 F.3d 577, 580 (7th Cir. 2010). "If the district court certifies the class, the case can proceed to the merits for the certified class of plaintiffs." *Id*. at 584. Accordingly, the Court considers whether it is proper to allow this case to proceed as a class action.

## I.  FACTUAL BACKGROUND

On January 2, 2009, Mr. Olson filed a "verified class action complaint for declaratory and injunctive relief" pursuant to 42 U.S.C. § 1983 and Indiana law, seeking to enjoin the practices of the Tippecanoe County Jail and naming Sheriff Brown in his official capacity as the Defendant [DE 1]. Mr. Olson sues on his behalf,[2] and on behalf of "any and all persons currently confined, or who will in the future be confined, in the Tippecanoe County Jail." [DE 1 at ¶ 6]. Further, the complaint seeks injunctive relief with respect to four areas related to incarceration at TCJ:

1)      Inadequate grievance procedure (210 I.A.C. 3-1-15(h));

---

[2]Mr. Olson's standing to initially sue is uncontested. Mr. Olson satisfied each of the Article III requirements for standing to sue by alleging an actual "injury in fact" that is concrete and particularized and is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable decision. *Arreola v. Godinez*, 546 F.3d 788, 794-95 (7th Cir. 2008) (stating that "it is best to confine the term 'standing' to the Article III inquiry and thus to keep it separate from the plaintiff's entitlement to relief or [the plaintiff's] ability to satisfy the Rule 23 criteria."). Mr. Olson had standing when he filed the complaint seeking injunctive relief because he was incarcerated in the Tippecanoe County Jail experiencing the alleged unlawful actions of the defendant.

2)      Inadequate law library access (210 I.A.C. 3-1-15(a));
3)      Opening of mail from the courts outside of an inmate's presence  (210 I.A.C. 3-1-16(c)); and
4)      Opening of mail from legal organizations and attorneys outside of an inmate's presence (210 I.A.C. 3-1-16(c)).

[DE 60 at 2-3].  The complained of conditions of incarceration are alleged violations of the Indiana Administrative Code regulations, as identified.  Also, the jail's handling of court and legal mail are alleged to violate the First and Fourteenth Amendments to the United States Constitution.  On January 20, 2009, Sheriff Brown removed the case from Tippecanoe County State Court to this Court based upon federal question jurisdiction and supplemental jurisdiction [DE 4].

The following uncontested facts are relevant to the pending motions.  By way of background, Mr. Olson was sentenced on or about November 1, 2003, to ten years in the Indiana Department of Corrections.  While pending transfer to a different facility, he was held at the Tippecanoe County Jail from August 29, 2008 to January 15, 2009[3] [DE 60 at p. 2].  During this time he experienced problems, and specifically alleges that while incarcerated at the jail, he received mail correspondence both from various courts and attorneys which was opened by jail staff outside of his presence, even though the outside of each envelope was marked either with the return address of a court or with the phrase "legal mail." [DE 1 at ¶¶ 14, 16, 18-19].  Mr. Olson submitted grievances to jail staff following incidences occurring on September 8 and October 17, 2008, wherein an envelope from a court was opened outside of his presence that contained documents involving a lawsuit in which Mr. Olson was representing himself [DE 1 at

---

[3]Although Mr. Olson was transferred from TCJ, the Seventh Circuit has determined that the inherently transitory exception to the mootness doctrine prevented dismissal of this case, and remanded the case for consideration of the pending motions. *Olson v. Brown*, 594 F.3d 577 (7th Cir. 2010).

¶¶ 15, 17; DE 1-2 at p. 1, 3]. The jail staff did not respond to either grievance, and Mr. Olson filed grievances concerning the jail's failure to respond and appealed the original grievances [DE 1 at ¶¶ 15, 17; DE 1-2 at p. 2, 4]. No response was given. *Id.*

On September 18, 2008, Mr. Olson requested that he be permitted to visit the law library in order to conduct legal research concerning pending legal proceedings for which he was representing himself [DE 1 at ¶ 20]. Mr. Olson's request was denied, and despite subsequent requests to visit the law library, he was never permitted to do so. *Id.* On September 18, Mr. Olson submitted a grievance concerning his not being given access to the law library [DE 1 at ¶ 21; DE 1-2 at p. 5]. The jail staff did not respond, and Mr. Olson submitted a grievance concerning the failure to respond and he appealed the original grievance [DE 1 at ¶ 21; DE 1-2 at p. 6]. No response was given. *Id.*

Between his arrival at the jail on August 29, 2008, and the filing of his complaint, Mr. Olson submitted at least twenty-one grievances and grievance appeals to the jail staff [DE 1 at ¶ 22]. The jail never responded to any of them. *Id.* Mr. Olson filed grievances over the conduct which he opposes,[4] and maintained a journal recounting the precise language of each grievance and each grievance appeal [DE 1 at ¶ 12].

On October 25, 2008, Mr. Olson submitted a grievance to the jail staff concerning the TCJ's failure to respond to grievances [DE 1 at ¶ 23; DE 1-2 at p. 7]. The jail staff did not respond to this grievance, and on November 7, 2008, Mr. Olson submitted an appeal of the grievance that received no response [DE 1 at ¶ 23; DE 8]. No response was given. *Id.*

---

[4]Sheriff Brown asserts that there is no indication that Mr. Olson filed a grievance specifically complaining that mail sent to him from an attorney was opened outside of his presence [DE 61-1], although Mr. Olson did complain that legal mail procedures where not being complied with by TCJ.

The repeated lack of response to grievances and appealed grievances occurred, despite the fact that the jail employs a grievance policy to address inmate concerns [DE 1 at ¶ 13]. Once an inmate files a grievance, the jail is responsible for responding to the grievance within seven days. *Id*. If the inmate does not agree with the decision, he or she may appeal the decision. *Id*. The jail then has fifteen days to respond to the appeal. *Id*.

As a temporary detention center, the parties stipulate that the following statistics regarding the Tippecanoe County Jail inmate population as of February 20, 2009 represented a typical portrait of the inmate population at any given time: the jail housed 529 inmates; 128 inmates had been incarcerated for less than 30 days; 119 inmates had been incarcerated between 30 and 90 days; 130 inmates had been incarcerated between 90 and 180 days; 121 inmates had been incarcerated between 180 and 365 days; 41 inmates had been incarcerated for more than 365 days; and the average length of stay for the 529 inmates was 139 days [DE 18 at ¶¶ 1-2]. Mr. Olson has filed affidavits of fifty-three inmates detailing their experiences with jail staff opening their legal mail outside of their presence, denying them access to the law library, and failing to respond to their grievances [DE 12-3 through 12-28; DE 27-3 through 27-9; DE 31-2 through 31-21]. Specifically, the affidavits reveal the following:

- At least forty-two inmates who submitted affidavits have had legal mail, sometimes several pieces of mail, from their attorney or attorneys opened outside of their presence;

- At least twenty-nine inmates who submitted affidavits have had legal mail, sometimes several pieces of mail, from courts opened outside of their presence;

- At least thirty inmates who submitted affidavits have been entirely denied access to the law library at the jail, including several inmates representing themselves in one or more legal proceedings; and,

- At least forty-four inmates who submitted affidavits have either filed grievances that have not received a response or been refused the form necessary to file a grievance in the first place.

*Id.*

Since Mr. Olson's transfer from Tippecanoe County Jail on January 15, 2009, he has been kept apprised of all developments in this case and wishes to remain involved in the litigation [DE 55-1 at ¶¶ 2-5]. Mr. Olson is in regular contact with his attorney and intends to make himself available for any court hearings or depositions that might be required of him in this cause. *Id.*

## II. ANALYSIS

Federal Rule of Civil Procedure 23 governs the certification of class actions in federal court. *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2548 (2011). Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. *Id.* at 2550. The Rule's four requirements—numerosity, commonality, typicality, and adequacy—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims. *Id.* (citations and internal quotations omitted). If all of these prerequisites are met, a court must also find that at least one of the subsections of Rule 23(b) is satisfied. In this case, Mr. Olson only seeks class certification under Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." "Failure to meet any of the Rule's requirements precludes class certification." *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). The Plaintiff, as the party seeking class certification, assumes the burden of demonstrating that certification is appropriate. *Trotter v.*

*Klincar*, 748 F.2d 1177, 1184 (7th Cir. 1984); *see Wal-Mart,* 131 S.Ct. at 2551 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.").

A district court has broad discretion to determine whether certification of a class action lawsuit is appropriate. *Arreola*, 546 F.3d at 794. The United States Supreme Court has made clear, however, that the district court is to perform a "rigorous analysis" to determine that the prerequisites of Rule 23 are satisfied when a class is to be certified because actual, not presumed, conformance with Rule 23(a) remains indispensable. *Wal-Mart*, 131 S.Ct. at 2551-52 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982)). Frequently, that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim, and this cannot be helped. *Id*. (noting that sometimes *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974) is mistakenly cited for the proposition that the merits of the claims for relief may not be considered in adjudicating the motion for class certification, and clarifying that such a proposition is "the purest dictum and is contradicted by other cases."). The purpose of the "rigorous analysis" is not to test the merits of the claim, however, but to determine whether the claim meets the requirements of Rule 23(a). *See Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 677 (7th Cir. 2001). Thus, while "nothing . . . prevents the district court from looking beneath the surface of a complaint to conduct the inquiries identified in that rule and exercise the discretion it confers," the modern approach to class actions "depends on making a definitive class certification decision before deciding the case on the merits, and on judicial willingness to certify classes that have weak claims as well as strong ones." *Id.*

7

**A.      Nature of the Class Claims**

Before the Court can conduct the rigorous analysis of the Rule 23(a) factors, it must first understand what the claims are because some types of claims are more susceptible to class treatment than others. Therefore, the Court will first determine the legal nature of Mr. Olson's claims, before proceeding to determine whether Rule 23(a)'s requirements are met and ultimately whether this class should be certified under Rule 23(b)(2).

1.      *Federal Constitutional Claims*

Mr. Olson presents this case in his pleadings and his legal arguments in support of class certification as a free speech issue under the First Amendment: under this theory, the jail's mail handling process is unlawful because it impinges on inmates' right to communicate confidentially with their attorneys (and the courts). The Sheriff, on the other hand, characterizes the suit as asserting a violation of the inmates' right to access to the courts, requiring proof of some actual non-frivolous claim that has been or is being impeded.

There is some support for both parties' positions, but neither position correctly captures the Seventh Circuit's present approach to this issue. In *Wolff v. McDonnell*, 418 U.S. 570, 574 (1974), the Supreme Court first considered whether the constitution limits prison authorities' ability to open and inspect incoming legal mail. In that case, Nebraska inmates challenged a prison policy of opening (but not reading) letters from attorneys in the inmates' presence. *Id.* at 575. The Court discussed several bases upon which a prohibition of opening or inspecting legal mail might be based, including First Amendment protections against any censoring of inmate mail, Sixth Amendment protections against intrusion into the attorney-client relationship in a criminal setting, and Fourteenth Amendment due process guarantees of access to the courts. *Id.* at 575–76. The Court identified weaknesses in each basis, but declined to decide which, if any,

right was operative because it held that even assuming one or more constitutional rights were implicated, the prison policy of opening (but not reading) legal mail in the presence of the inmate did not infringe those rights.

After *Wolff*, courts, including the Seventh Circuit, have acknowledged that "when a prison receives a letter for an inmate that is marked with an attorney's name and a warning that the letter is legal mail, officials potentially violate the inmate's rights if they open the letter outside of the inmates presence." *Kaufman v. McCaughtry*, 419 F.3d 678, 686 (7th Cir. 2005). Several courts, including the Seventh Circuit, have identified the pertinent constitutional right as the right to court access under the Fourteenth Amendment's due process clause. *See id.* The nature and scope of this right, however, are crucial: there is no *per se* right to "confidentiality of legal mail" but instead a right to access the courts. In the related context of adequate prison libraries and legal assistance programs, the Supreme Court, however held in *Lewis v. Casey*, 518 U.S. 343, 351 (1996), that "[i]nsofar as the right vindicated by *Bounds* is concerned, 'meaningful access to the courts is the touchstone,' and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in [a] library or legal assistance program hindered his efforts to pursue a legal claim." The Seventh Circuit has confirmed that *Lewis* informs mail-handling claims as well: "there must likewise by [sic] a showing of hindrance in a claim of interference with a prisoner's communications with his lawyer." *Guarjardo-Palma v. Martinson*, 622 F.3d 801 (7th Cir. 2010). But *Guarjardo-Palma* also noted that "proof of a *practice* or reading a prisoner's correspondence with his lawyer should ordinarily be sufficient to demonstrate hindrance." *Id.* at 805. This is because a prisoner's knowledge of such a practice (whether or not it was ever employed on his own mail) "will to a high probability reduce the candor of those communications." *Id.*

Some courts have also held that the First Amendment's free speech provision specially protects "the right to hire and consult an attorney," and "[b]ecause the maintenance of confidentiality in attorney-client communications is vital to the ability of an attorney to effectively counsel her client, interference with this confidentiality impedes the client's First Amendment right to obtain legal advice." *Denius v. Dunlap*, 209 F.3d 944, 953–54 (7th Cir. 2000). The Third Circuit Court of Appeals applied this reasoning to support special protections for legal mail within prisons in *Jones v. Brown*, 461 F.3d 353 (3d. Cir. 2006). There, it held that "[a] state pattern and practice, or, as is the case here, explicit policy, of opening legal mail outside the presence of the addressee inmate interferes with protected communications, strips those protected communications of their confidentiality, and accordingly impinges upon the inmate's right to freedom of speech." *Id.* at 359.

The Seventh Circuit appears to have distanced itself from the view that special protections for legal mail are rooted in the right to free speech. In *Guarjardo-Palma*, the court commented that while "a number of cases characterize the reading of mail to or from a prisoner's lawyer in a pending or impending litigation as infringing the right of free speech rather than or in addition to the right of access to the courts" because the destruction of the security of confidentiality chills the individual's ability to engage in protected speech, "it seems more straightforward to base the concern with destroying that confidentiality on the right of access to the courts." 622 F.3d at 802. But while *Guarjardo* may indeed have established that, in the Seventh Circuit, challenges to the handling of legal mail are actionable only as access to court claims, that is a question of the merits of the free speech claim, not whether it can be resolved on a class-wide basis.

An additional complexity is the scope of legal mail that is protected, either as protected

speech under the First Amendment or as an adjunct to the right to access the courts under the Fourteenth. Some Courts of Appeals have defined the term broadly to include not only attorney-client communications, but also communications from government agencies and courts. *See, e.g.*, *Sallier v. Brooks*, 343 F.3d 868, 876–77 (6th Cir. 2003) (free speech protection extends to court mail); *Bieregu v. Reno*, 59 F.3d 1445, 1452 (3d Cir. 1995) (same), *abrogated on other grounds by Lewis v. Casey*, 518 U.S. 343; *Ramos v. Lamm*, 639 F.2d 559, 582 (10th Cir. 1980) ("legal mail" includes "privileged correspondence with counsel, public officials, and agencies"). The Seventh Circuit has been critical of the need for expansive protection of mail, such as public court filings, that are not in any sense confidential. *See Guarjardo-Palma*, 622 F.3d at 804; *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) ("[P]rison employees can open official mail sent by a court clerk to an inmate without infringing on any privacy right."); *Martin v. Brewer*, 830 F.2d 76, 78 (7th Cir. 1987) ("It is . . . not apparent to us why [court mail] should be regarded as privileged and how [the prisoner] could be hurt if the defendant read these documents before or after [the prisoner] does."). The court has acknowledged, however, that some non-attorney mail—including mail originating from a court—might be confidential and require special treatment. *See Guarjardo-Palma*, 622 F.3d at 804 ("Suppose the prisoner were asking that materials that he had submitted be held *in camera* or withheld from his adversary."); *Castillo v. Cook County Mail Room Dep't*, 990 F.2d 304 (7th Cir. 1993) (holding that complaint that jail officials had opened two letters from a court and one from the Department of Justice outside of an inmate's presence could not be considered "frivolous" under the then-current interpretation of 28 U.S.C. § 1915A); *Martin*, 830 F.2d at 78 (noting that mail from public officials is potentially protected).

Thus, whatever the ultimate merits of the constitutional claims, the Court identifies three

separate claims that require individualized consideration at the class certification stage. *First*, does the practice of opening legal mail (however defined) violate prisoners' free speech rights under the First Amendment?  *Second*, does the prison have a practice or policy of opening mail from attorneys outside of the presence of the addressee prisoners, and if so does this practice or policy violate some prisoners' right to access the courts under the Fourteenth Amendment? *Third*, does the prison have a pattern or practice of opening mail from courts outside of hte presence of the address prisoners, and if so does this practice or policy violate some prisoners' right to access the courts under the Fourteenth Amendment?

      2.    *State-Law Claims*

Mr. Olson's other claims are relatively more straightforward. He alleges that three distinct policies or practices of the Tippecanoe County Jail violate provisions of the Indiana Administrative Code. First, Mr. Olson and at least thirty other prisoners complain that the jail has a practice or policy of refusing to permit inmates to access the law library in violation of 210 IAC 3-1-15(a), which provides that "[j]ail inmates not represented by counsel shall have reasonable access to an adequate law library." The parties appear to disagree over whether prisoners who are represented by attorneys in one or more cases are entitled to law library access, but the Court need not resolve that question at this point because class certification will be appropriate under either approach.  *See infra* II.B.1 & n.5. Second, Mr. Olson complains that the jail's mail-handling policies implicate not only the federal constitution but also the express provisions of 210 IAC 3-1-16(c), which forbids the opening of  "[c]orrespondence to or from government officials, courts, attorneys, or representatives of the public news media" except "in the presence of the addressee for the purpose of examining the contents for contraband or prohibited property." Finally, Mr. Olson alleges that the jail has a practice or policy of failure to

respond within a reasonable amount of time to prisoners' written grievances, in violation of 210 IAC 3-1-15(h).

**B.      Class Certification**

Rule 23(a) sets four requirements: numerosity, commonality, typicality, and adequacy of representation. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart,* 131 S.Ct. at 2551. Further, as discussed above, the Court is to perform a "rigorous analysis" to determine that the prerequisites of Rule 23 are satisfied when a class is to be certified because actual, not presumed, conformance with Rule 23(a) remains indispensable. *Id.* at 2551-52 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-61 (1982)). Frequently, that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim, and this cannot be helped. *Id.* A district court has broad discretion to determine whether certification of a class action lawsuit is appropriate. *Arreola*, 546 F.3d at 794.

1.      *Rule 23(a)(1): Numerosity*

The first requirement under Rule 23(a) is that the purported class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). To be impracticable, joinder need not be impossible, but instead must be shown to be inconvenient and difficult. *See Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993); *Gomez v. Illinois State Bd. of Ed.*, 117 F.R.D. 394, 398–99 (N.D. Ill. 1987). When determining if joinder of all class members is impracticable, courts often consider many factors, including:  the class size; judicial economy arising from the avoidance of a multiplicity of actions; the ease of identification of members of the proposed class; the geographic dispersion of class members; the size of each plaintiff's

claim; the financial resources of the class members; the ability of claimants to institute individual

suits; and requests for prospective injunctive relief which would involve future class members;

and any other factors relevant to the practicability of joining all the class members. Alba Conte

& Herbert Newberg, *Newberg on Class Actions* § 3:6 (2002 & Supp. 2011); *see also Gomez*, 117

F.R.D. at 399 (listing some similar factors). "Mere speculation" and "conclusory allegations" of

the class size will not support a finding that joinder is impractical. *Arreola*, 546 F.3d at 797. A

court must rely on simple common sense when determining whether a class size meets the

numerosity requirement. *See Flood v. Dominguez,* 270 F.R.D. 413, 417 (N.D. Ind. 2010) (citing

*Redmon v. Uncle Julio's of Ill., Inc.,* 249 F.R.D. 290, 294 (N.D. Ill. 2008)).

Mr. Olson asserts that he meets the numerosity requirement with respect to all of his

claims because the jail operates near its capacity of 546 inmates, as demonstrated by jail records

which reflect a roster of inmates at any given time, and the inmates are subjected to the alleged

wrongful policies. Mr. Olson has also filed fifty-three inmate affidavits, in which the inmates

complain of jail staff opening their legal and court mail outside of their presence, denying them

access to the law library, and/or failing to respond to their grievances or refusing to provide the

form needed to file a grievance. The inmate affidavits were made under oath and Sheriff Brown

has not produced anything to suggest that they are false or untrustworthy.

The Court has identified several discreet claims in Mr. Olson's complaint, and not all of

them necessarily affect the same class of prisoners. To begin with some common considerations,

the impracticability of joinder—which underlies the numerosity requirement—is enhanced by

two factors beyond raw numbers. First, the class includes future members, and a significant

number of them, if the sample from an early 2009 snapshot is representative. Such future

members make joinder inherently impracticable because there is no way to know who they will

be. *See Gomez*, 117 F.R.D. at 399 (finding that the inclusion of future members in a class of "Spanish-speaking children who are or will be enrolled in Illinois public schools, or who are eligible or will be eligible to be enrolled in Illinois public schools, and who should have been, should be, or who have been, assessed as limited English proficient" made joinder impracticable). Second, the inherently transitory nature of the class members makes their joinder in a single, non-class suit impossible, since only a portion of the class will have standing to bring their claims at any one time. *See Ind. Prot. and Advocacy Servs. Comm'n v. Comm'r, Ind. Dept. of Corr.,* No. 1:08-cv-1317, 2010 WL 1737821 *1 (S.D. Ind. Apr. 27, 2010) ("[B]oth the transient nature of the inmate population and the request for injunctive relief that will also inure to the benefit of future, currently unknowable, class members likewise support a finding that joinder is impracticable."); *see also Olson v. Brown,* 594 F.3d 577, 584 (7th Cir. 2010) ("The pervasive nature of these claims, as evidenced by the fifty-three affidavits outlining problems similar to those complained of by Olsen, makes it likely that TCJ's alleged practices of opening inmates' legal mail, denying inmates access to the law library, and failing to respond to inmates' grievances will continue.").

Moving to the specifics of the individual claims, the Sheriff does not dispute that some of the claims in the complaint affect a jail-wide class of prisoners. The Court agrees with the parties that a jail-wide class is appropriate for the state-law claims that the prison's grievance procedure and mail-handling policy do not conform to the provisions of the Indiana Administrative Code. To these, the Court would add that the federal claim that the mail handling policy itself violates the prisoners' free speech rights under the First Amendment by chilling protected confidential communications is also a jail-wide class. Given that the jail operates near its capacity of 546 inmates, there is no question that this consideration alone makes the class so numerous that

joinder would be impracticable.

That leaves three remaining claims, at least according to the Court's delineation above: the claim that the law library access policies violate the Indiana Administrative Code and the two claims that the mail handling policies for mail from attorneys and the courts, respectively, violate the federal constitutional right to access to the courts under the Fourteenth Amendment. With regard to the law library access claim, Sheriff Brown argues that the class of inmates affected by the alleged library access policies is not jail-wide because the code provisions in question specifically apply only to those inmates not represented by an attorney. The Court does not agree. The complaint alleges that there is a policy of denying inmates adequate law library access, regardless of whether they are represented by counsel. It may be true (on the merits) that some prisoners, including some of those who filed the affidavits, were not entitled to the library access they were seeking on claims in which they were already represented. But just because an inmate is represented by counsel on a particular matter—perhaps a criminal appeal or post-conviction petition or a civil rights action—does not necessarily mean that such an inmate is never entitled to reasonable law library access under the regulations. The regulation at issue states that "[j]ail inmates not represented by counsel shall have reasonable access to an adequate law library." 210 I.A.C. 3-1-15. It does not say (and the Court is not aware of any judicial interpretations suggesting) that this provision only applies when an inmate has a currently pending pro se claim. And since no inmate is represented by counsel for all conceivable issues, every inmate may have an alleged right under the regulations to access the law library, whether to research pending claims, explore potential claims, or perhaps just read about the law. Whether the jail's actual policies or practices deny reasonable law library access would be a question for the merits, but the affidavits before the court are sufficient to satisfy the Court's rigorous

analysis that the jail has a jail-wide policy of restricting adequate law library access, and that this is the policy the class asks the Court to enjoin. This is enough to demonstrate the existence of a jail-wide class. Indeed, the affidavits in the record show that in many cases, the same prisoners were simultaneously pursuing attorney-represented cases and pro se cases.[5] Regardless, the Court finds that the relevant class of prisoners for the law library access claims is all those prisoners who are or will be incarcerated in the Tippecanoe County Jail, and that this class is sufficiently numerous to support class certification.

Second, with regard to the federal access to court claims, the proper class is not jail-wide but rather limited to those prisoners who are being hindered in bringing non-frivolous claims by the alleged policies. This is because, as explained above, interference with confidential legal correspondence only *potentially* violates the right to access the courts, so only those prisoners

---

[5]Even if the class were more narrowly defined, the Court would still find joinder impracticable. A look at the inmate affidavits filed in this case reveal that of the thirty inmates who were not given law library access, twelve inmates stated that they requested and were denied access to the law library to conduct research in cases in which they were proceeding pro se. *See* Affidavits of Timothy Adams [DE 12-4], Cornelius Powell [DE 12-5], Forrest Elliott [DE 12-6], Roderick Elam [DE 12-11], Carlo Palermo [DE 12-18], Edward Luman [DE 12-23], Wesley Kelly [DE 31-3], Seth Darland [DE 31-6], Tony Modesitt [DE 31-7], George Chapman [DE 31-10], Nikki Snapp [DE 31-12], and Christopher Stivers [DE 31-15]. An additional eighteen inmates did not indicate whether they were representing themselves, but they did state that they wanted to go to the law library to conduct research on a "pending case." *See* Affidavits of Anthony Massengill (pending "child support" case) [DE 12-3], Timothy Reynolds [DE 12-9], Deon Harris [DE 12-10], Tromaine Langham [DE 12-12], Donald Anderson [DE 12-14], Jamaal Moore [DE 12-16], Ronald Cheesman [DE 12-17], Qune Vantrease [DE 12-19], Kenneth Norwood [DE 12-20], Rami Wahood [DE 12-24], Mark O'Connor [DE 12-25], Jonathon Haniton [DE 12-26], Michael Hayenga [DE 12-27], James Johnson [DE 27-4], Jacob Parker [DE 31-13], Kelvin Bogan [DE 31-14], Edward Dugan [DE 31-19], and Antonio Sessions [DE 31- 21]. Of these eighteen inmates, neither Qune Vantrease [DE 12-19] nor James Johnson [DE 27-4] indicated that they were represented by any counsel on any matters, and they did not assert that mail from any attorneys was opened by TCJ. These numbers, combined with the inherent impracticability of joinder in a case involving transitory and future members, would independently satisfy the numerosity requirement.

who actually have or will have non-frivolous legal claims are conceivably harmed by the prison's policies. Sheriff Brown argues that "there is no information at all as to how many [inmates] were prosecuting non-frivolous legal claims, whether the attorneys in question were assisting them with those legal claims, and whether the content of the mail was such that communication was impaired from inmate to attorney with respect to the legal claim in question."

The Court finds the class of inmates who share an access to courts claim based on the alleged policy of opening *attorney mail* outside the presence of the addressee prisoner to be sufficiently numerous that joinder would be impracticable for several reasons. It is not true, as the Sheriff claims, that there is *no* information about the number of inmates who may have had non-frivolous legal claims impeded by the alleged policies. First, as the Court has already noted, *Guarjardo-Palma* suggests that the putative class in this case includes every prisoner who has a non-frivolous claim because the existence of the alleged mail-handling policy would itself demonstrate a hindrance to that claim. Second, thirty affidavits attest that each inmate was represented by counsel in some matter, which itself suggests that these claims were non-frivolous. Finally, the Court notes that the affidavits submitted reflect only a representative sample of the prison population at the time Mr. Olson sought class representation. Common-sense dictates that the number of prisoners with attorneys who have non-frivolous legal claims at any given time is somewhat—perhaps significantly—larger than the sum total of the affidavits submitted.

The Court has concerns, however, about the numerosity of the class of prisoners whose non-frivolous claims have been hindered by the alleged policy of opening *court mail* outside the presence of the addressee prisoner. Admittedly, the affidavits submitted in support of class

certification all contain the rote statement that the practice of opening mail either from attorneys or from courts "hampers my ability to communicated with my attorneys and to represent myself in cases that I have filed." What neither Mr. Olson nor the affiants offer, however, is some plausible explanation of how the practice of opening mail from the courts hampers the prosecution of their cases. Unlike mail from attorneys, mail from courts is generally not confidential but rather a matter of public record. *See Guarjardo-Palma*, 622 F.3d at 804; *Antonelli v. Sheahan*, 81 F.3d 1422, 1431–32 (7th Cir. 1996); *Martin v. Brewer*, 830 F.2d 76, 78 (7th Cir. 1987). The logic of *Guarjardo-Palma* therefore does not extend to mail from courts because a practice of reading such mail does not necessarily undermine the candor of those communications. Of course, as the court recognized in *Guarjardo-Palma* (and elsewhere), *some* mail to or from a court may be confidential—the point of in camera filings, for example, would be defeated if prison officials could read them at will. Perhaps there are other ways in which the interception of court mail might hamper a prisoner's ability to represent himself. But the complaint, affidavits, and briefs provide no basis for the Court to determine that any prisoner's claims (including Mr. Olson, which causes other problems that will be discussed *infra*) are actually being hindered by the alleged policy, much less a group sufficiently numerous to permit class certification for this claim.

2.     *Rule 23(a)(2) & (3): Commonality and Typicality*

The second and third requirements under Rule 23(a) are that the plaintiff must show that "there are questions of law or fact common to the class," and that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(2), (a)(3). Concerning the commonality requirement, claims of individual class members may arise from a "common nucleus of operative fact," which is usually satisfied where the defendant

19

engaged in standardized conduct towards members of the proposed class. *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). Class certification cannot be defeated simply because there are some factual variances among the proposed members. *Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992); *see Wal-Mart*, 131 S.Ct. at 2556 ("We consider dissimilarities not in order to determine (as Rule 23(b)(3) requires) whether common questions *predominate*, but in order to determine (as Rule 23(a)(2) requires) whether there *is* "[e]ven a single [common] question.") (emphasis in original). The question of typicality is closely related to the question of commonality. *Rosario*, 963 F.2d at 1018. A claim is typical if it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . are based on the same legal theory." *Id.* Even though some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (citations omitted).

The Defendant does not contest that Mr. Olson could meet the commonality and typicality requirements of the claims made pursuant to the Indiana Administrative Code. The Court agrees that Mr. Olson has made the requisite showing because questions of law or fact are common to the class, that is, whether grievances were investigated and responded to in accordance with 210 I.A.C. 3-1-15(h), whether jail inmates not represented by counsel in pending cases were provided reasonable access to the law library in accordance with 210 I.A.C. 3-1-15(a), and whether mail from courts and attorneys was opened by jail officials outside the presence of the inmates in violation of 210 I.A.C. 3-1-16(c). Unlike the situation in *Wal-Mart*, where the plaintiffs could not demonstrate that the entire company operated under a general policy of discrimination, or a specific practice that tied all of their claims together, 131 S.Ct. at

2555-56, in this case, Mr. Olson has shown that the TCJ's specific practices relative to the handling (or non-handling) of grievances, opening of legal mail, and restricting access to the law library, have caused the inmates to suffer the same potential injury, which ties all of their jail standards claims together. *See Tyson v. Grant County Sheriff*, No. 1:07-cv-10, 2007 WL 1395563 (N.D. Ind. May 9, 2007) (finding the commonality and typicality requirements met with respect to claims alleged under state law and under the Fourteenth and Eighth Amendments, where the proposed class of jail inmates were subjected to the same practice of jail overcrowding); *see also Hassine v. Jeffes*, 846 F.2d 169, 177 (3d. Cir. 1988). It is the practice or standard course of conduct that TCJ has generally employed with respect to the grievance process, mail handling, and making the library accessible, that gives rise to the claims of Mr. Olson and all of the other class members—claims which are all based on the same legal theory. Moreover, the question of whether Indiana state law provides a private right of actions to enforce violations of prison regulations is itself a common question of law that will be central to this case.

Sheriff Brown does challenge the commonality and typicality of the federal constitutional claims. Because each of the claims that the Court identified above involve different harms and different methods of proving those harms, the Court will consider the commonality and typicality of each claim separately. First, with regard to Mr. Olson's free speech claims under the First Amendment, the Court finds that the commonality and typicality elements are easily met. As the Court understands this theory, Mr. Olson would need to prove that there is in fact a practice of opening legal mail outside of the prisoners' presence and that this practice chills the prisoners' ability to exercise their free speech right to communicate confidentially with their attorneys (or the courts). *See Jones v. Brown*, 461 F.3d at 358–60. Mr. Olson's claims in this

21

regard are exactly the same as the class: according to his complaint, and he thus satisfies the typicality requirement of Rule 23(a)(3).

The Sheriff's challenge to certification of any federal constitutional claims seems to be that the claims are cognizable, if at all, only as an access to courts claim, but this argument goes entirely to the merits of the First Amendment claim and not to the appropriateness of class certification. The Court has already noted that the Seventh Circuit appears to agree with Sheriff Brown that freedom of speech does not do any additional work for legal mail than it does for regular prison mail, and that the appropriate claim is an access to courts claim. *See Guarjardo-Palma*, 622 at 802. But if that is the case, it means that the entire class will lose together, not that the class should not be certified in the first place.  Moreover, even if current circuit precedent precludes their claims, there is no reason that Mr. Olson cannot ask the Seventh Circuit to reconsider its previous holdings or seek to challenge the circuit law in the Supreme Court.

Second, the access to courts claim based on the handling of attorney mail also satisfies the commonality requirement for similar but slightly different reasons. There are at least *some* common questions for the claim that the prison's handing of confidential attorney-client mail violates putative class members right to access the courts. Unlike the free speech claims, the opening of attorney mail only potentially violates the right to access the courts because the claimant must also demonstrate some hindrance to a non-frivolous claim. But, in practice, the important common question that will determine this case is the same because the access to court claim would require proof that the jail has a practice of opening attorney-client mail, and this factual question is common to the class. *See Wal-Mart*, 131 S.Ct. at 2551 ("What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of

22

the litigation." (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L.Rev. 97, 131–32 (2009)).

For the access to courts claim, like the free speech claim, the Court finds that the existence of a practice or policy is the lynchpin of the entire claim. As described above, the essential elements of an access to courts claim are that some nonfrivolous claim is or will imminently be hindered, and as the Seventh Circuit held in *Guarjardo-Palma*, this hindrance can be shown in the case of attorney mail simply by demonstrating that there is a practice of reading that mail. 622 F.3d at 805. If Mr. Olson is able to prove the alleged policy, he will have advanced the class claims significantly. If he fails, he will likely have failed to establish the class claims at all. Moreover, although the Rule 23(a)(2) inquiry into commonality is distinct from the inquiry into whether a Rule 23(b)(2) class seeking injunctive relief is appropriate, the common *remedy* sought in this case illustrates of the commonality of the claims themselves: the common claims—whether the alleged mail-handling policy exists and whether it violates the constitution—will result in common relief or none at all.[6]

Moreover, having established what the common questions are, it is clear that Mr. Olson's claims are typical of the class. At the time of his complaint, he was subject to any prison-wide policy and has alleged that he was pursuing cases in various courts, so his claim ultimately depends on the existence of an unconstitutional policy or practice of opening mail from attorneys outside the presence of prisoners. If Mr. Olson is entitled to injunctive relief, the entire class will

---

[6]It is also worth noting that this case is unlike cases wherein the plaintiffs pursue both money damages and uniform, class-wide equitable relief, which could jeopardize the Rule 23(b)(2) presumption of cohesion and homogeneity, because individual claims for compensatory or punitive damages typically require judicial inquiry into the particularized merits of each individual plaintiff's claim. *See Lemon v. Int'l Union of Operating Eng'rs, Local No. 139, AFL-CIO*, 216 F.3d 577, 580 (7th Cir. 2000); *Roe v. Bridgestone*, 257 F.R.D. 159, 170-71 (S.D. Ind. 2009).

be as well. This claim thus also satisfies the commonality and typicality requirements of Rule 23(a)(2) and (3).

The same cannot be said for the third federal claim, that the handling of prisoner mail from courts violates the prisoners right to access the Courts. While the existence of a particular mail handling policy is a question that is common to the putative class, that policy is not integral to the class claims in the same way as it is for attorney-mail. As already noted, the logic from *Guarjardo-Palma* does not apply in the same way to court mail because a policy of reading mail from courts does not automatically reduce the candor of communications between prisoners and courts. This means that if the alleged policy exists, it will hinder (or not) each class member in a different way. It is not obvious, therefore, that the common question of whether there is a policy of opening mail from courts outside the presence of prisoners will produce a common answer that will meaningfully advance the litigation. *See Wal-Mart*, 131 S.Ct. at 2551.

Moreover, even if the Court assumed that the common question of the existence of the alleged policy is sufficient to establish commonality, the class definitively fails the typicality requirement because Mr. Olson *has not alleged that his claims were being hindered by the policy in any way.* That means that even if Mr. Olson had established a sufficiently numerous class of prisoners who could plausibly claim that the practice of opening mail from courts is hindering non-frivolous legal claims, and that their claims could be meaningfully advanced by the resolution of the common question of whether or not such a policy exists, Mr. Olson cannot represent that class of prisoners because his own claim lacks an essential element the hypothetical class's claims. In other words, even if there were a class to certify, Mr. Olson would not be a member of that class because there is no evidence that any of his claims have been hindered by the alleged policy. The Supreme Court, however, has "repeatedly held that 'a class

representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members.'" *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982) (quoting *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). Because of this, the Court will not certify the class relative to this particular claim.

3.      *Rule 23(a)(4): Adequacy of Representation*

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy of representation is composed of two parts: "the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest" of the class members. *Retired Chicago Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993). "A class is not fairly and adequately represented if class members have antagonistic or conflicting claims." *Rosario*, 963 F.2d at 1018.  Also, counsel for the named plaintiffs must be experienced and qualified and generally be able to conduct the litigation. *See Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 896 (7th Cir. 1981).

With respect to the first consideration, Sheriff Brown does not challenge the qualifications of attorneys Gavin Rose and Kenneth Falk, and concedes that they are more than adequate to serve as class counsel.  The Court agrees that counsel are certainly skilled and experienced in this type of litigation, as evidenced by the fact that they were successful on appeal in this matter and have complied with the rules of this Court in seeking to certify the class.  Mr. Rose also personally represents that he is skilled and experienced in this type of litigation.  The Court believes that Mr. Olson and the class' named counsel will work for the benefit of the proposed class in seeking relief that will protect the rights of class members both

known and to become known.

Sheriff Brown does, however, challenge Mr. Olson fitness as a class representative on several grounds, arguing that Mr. Olson is not an adequate representative of the absent class members because his criminal background includes a conviction for fraud on a financial institution, which make his credibility open to attack. Sheriff Brown further questions whether Mr. Olson could adequately represent class members because he may not have exhausted his administrative remedies with respect to the attorney-client mail handling claim, and because he cannot make a claim of inadequate law library access since he is represented by counsel.

The Court disagrees with Sheriff Brown on all counts. It is true that personal characteristics, such as the credibility and integrity of a putative class representative, have a direct bearing on the ability to adequately represent absent members of the class. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949). It is also true that a named plaintiff who has serious credibility problems or who is likely to devote too much attention to rebutting an individual defense may not be an adequate class representative. *See CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721 (7th Cir. 2011); *see also Schleicher v. Wendt*, No. 1:02-cv-1332, 2009 WL 761157 *3 (S.D. Ind. Mar. 20, 2009) (collecting cases where courts determined that a criminal fraud conviction undermines a proposed class representative's adequacy to represent the class). However, Sheriff Brown points to no case law suggesting that Mr. Olson's conviction for a felony crime of dishonesty renders him inadequate to represent the proposed class *per se. See Turner v. Glickman*, 207 F.3d 419 (7th Cir. 2000) (class representative was a convicted felon representing a class of other convicted felons made ineligible for federal benefits due to drug convictions); *Roe v. Bridgestone Corp.*, 257 F.R.D. 159, 168-69 (S.D. Ind.

2009) (collecting cases where attacks on the named class representative's credibility was sufficient to render him or her inadequate).

Here, Mr. Olson's credibility is being questioned on the basis of an almost eight year old conviction obtained pursuant to a plea agreement which has no substantive relation to this case. *See Olson v State*, 909 N.E.2d 517 (Ind. Ct. App. 2009) (table opinion). Relative to this case, Mr. Olson has already filed various affidavits in support of the class action, none of which are contested as being incredible. These facts suggest that any questions as to Mr. Olson's credibility are not so pervasive so as to jeopardize the interests of the absent class members. As a result, the Court does not believe that Mr. Olson's unrelated criminal history disqualifies him as an adequate representative for the proposed class.

Further, the Court finds that Mr. Olson's being represented by counsel in some pending cases does not prevent him from bringing a claim for inadequate access to the law library. As explained above, the fact that a prisoner is represented in one case does not necessarily mean that he is not entitled to law library access in other cases in which he does not have an attorney. Mr. Olson alleged in his verified complaint that he has pending lawsuits in which he represents himself [DE 1 at ¶¶ 12, 14, 16, 18, 20]. Similar to the other potential class members who represent themselves in some but not all of their pending cases, Mr. Olson claims that he was entitled to reasonable access to the law library, and the Court finds that he can adequately represent the class in this respect.

The Court also disagrees that Mr. Olson cannot adequately represent the class with respect to his attorney-client mail claim because he may have failed to exhaust his administrative remedies, as required by 42 U.S.C. 1997e(a). This is an affirmative defense that would fail if the

grievance remedy was rendered unavailable by TCJ prison officials. *See Kaba v. Stepp*, 458 F.3d 678, 684-86 (7th Cir. 2006); *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) ("Prison officials may not take unfair advantage of the exhaustion requirement, however, and a remedy becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting."). The class certification stage is not the place to resolve the merits of a particular defense, but the Court is satisfied that this affirmative defense will not be a significant factor in the ultimate resolution of this case. In fact, Mr. Olson, and the class he seeks to represent, allege that the jail has a practice of not responding to grievances or refusing to provide the form necessary to file a grievance in the first place, thus rendering the grievance process unavailable for purposes of exhaustion. Mr. Olson himself alleges that he filed twenty-one grievances and twenty-one grievance appeals which all received no response, and he indicates that those grievances concerned each of the issues alleged in his complaint sufficient to put the prison on notice of his complaints. The Court finds that at this stage the evidence is sufficient to show that Mr. Olson has the same interest as the class members in enforcing the jail's grievance procedure and that Mr. Olson's claims are typical of the class.

Lastly, even though Mr. Olson has since been transferred from TCJ, he has remained apprised of the case's progress and he attests that he will remain diligently involved in the case and in regular contact with class counsel and make himself available for discovery. Mr. Olson understands the substance of his and the proposed class' common legal position and he has shown a sufficient interest in the outcome to ensure vigorous advocacy. Under the present circumstances, Mr. Olson is adequate to represent the class. Accordingly, Mr. Olson has met the

adequacy requirement and satisfied all of the Rule 23(a) requirements for class certification for all claims except the claim that the prison's policy Mr. Olson and others have been denied their Fourteenth Amendment right access to court.

4. *Rule 23(b)(2): Common Grounds for Injunctive and Declaratory Relief*

In addition to meeting class certification requirements under Rule 23(a), plaintiff's proposed class must satisfy the requirements of one of the three subsections of Rule 23(b). Because Mr. Olson only seeks certification under Rule 23(b)(2), the Court limits its consideration to whether certification under that subsection is proper.

Rule 23(b)(2) covers cases where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *see Lemon v. Int'l Union of Operating Eng'rs, Local No. 139, AFL-CIO*, 216 F.3d 577, 580-81 (7th Cir. 2000) (noting that Rule 23(b)(2) certification does not ensure personal notice or an opportunity to opt out even if some or all of the plaintiffs pray for monetary damages). The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 131 S.Ct. at 2557 (citing Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.Rev. 97, 132 (2009)). In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. *Wal-Mart*, 131 S.Ct. at 2557. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant. *Id.*

In the present case, final injunctive relief or corresponding declaratory relief in relation to TCJ's procedures, if ultimately granted, would be appropriate respecting the class as a whole. The appropriateness of granting the relief requested will be based on a common issue that is central to the litigation for all of the proposed class members—that is, whether Sheriff Brown has a policy or practice of failing to appropriately handle inmate grievances, opening legal mail outside of the inmates' presence, and not providing reasonable access to the law library to inmates proceeding pro se in pending cases. The resolution of each class member's claim will hinge on Defendant's standardized conduct—conduct which can be enjoined or declared unlawful only as to all of the class members or as to none of them. Because a single injunction or declaratory judgment would provide relief to each member of the class, class certification is appropriate under Rule 23(b)(2).

5. *Conclusion and Class Certification*

Because Mr. Olson has demonstrated that certification is appropriate pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), the Court ORDERS that this case be certified as a class action. The Court certifies a class comprised of any and all persons currently confined, or who will in the future be confined, in the Tippecanoe County Jail. The class may pursue claims for injunctive and declaratory relief for alleged violations of the Indiana Administrative Code regulations: inadequate grievance procedure (210 I.A.C. 3-1-15(h)); inadequate law library access (210 I.A.C. 3-1-15(a)); opening of mail from the courts outside of the inmates' presence (210 I.A.C. 3-1-16(c)); and opening of mail from legal organizations and attorneys outside of the inmates' presence (210 I.A.C. 3-1-16(c)); and for alleged violations of the First Amendment's protections for free speech, under to 42 U.S.C. § 1983. The Court also certifies a subclass

comprised of only those members of the jail-wide class who are currently pursuing, or may in the future pursue, non-frivolous legal claims in state of federal court. This subclass may pursue injunctive and declaratory relief for alleged violations of the Fourteenth Amendment's protections of the right of access to court, under 42 U.S.C. § 1983, relative only to the prison's handling of mail from attorneys. Because certification of the class was delayed through the course of an appeal and for some time thereafter, either party may petition the Court for modification of the class definition if subsequent evidence suggests that the class as defined is inappropriate. Fed. R. Civ. P. 23(c)(1)(C).

**C.    Appointment Of Class Counsel**

Rule 23 requires that a court certifying a class also appoint class counsel. Fed. R. Civ. P. 23(c)(1)(B), (g). Class counsel must fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(a)(4). In appointing class counsel, the court must consider the following: "the work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; counsel's knowledge of the applicable law; and the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

As previously detailed, the Court finds that Attorneys Gavin Rose and Kenneth Falk will fairly and adequately represent the interests of the class.  Mr. Rose and Mr. Falk have extensively reviewed and investigated the potential claims in this case, have much experience in handling class action litigation, have knowledge of the law relative to the claims asserted, and

have the resources that are necessary to represent the class. Therefore, in compliance with Rule 23(g)(1), Mr. Rose and Mr. Falk will be appointed class counsel.

### III. CONCLUSION

Because Mr. Olson has demonstrated that certification is appropriate pursuant to Fed. R. Civ. P. 23(a) and (b)(2), the Court **GRANTS** in part and **DENYS** in part Mr. Olson's Motion to Certify Class; **ORDERS** that this case be certified as a class action with the class and subclass defined as stated in Section II.B.5, *supra*; **APPOINTS** Gavin Rose and Kenneth Falk as class counsel; and, **DIRECTS** class counsel to provide notice of this certification to each individual member of the class who can be identified through reasonable effort. Finally, because Mr. Olson's standing in this case is contingent on class certification, the Court **DISMISSES AS MOOT** any claims not certified for class treatment.

SO ORDERED.

ENTERED:  July 25, 2012 


_____/s/ JON E. DEGUILIO_____
Judge
United States District Court