UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| JEFFREY MARK OLSON, on his own behalf and on behalf of a class of those similarly situated,  )  )  ) Plaintiffs,  )  ) v.  ) TRACY BROWN, in his official capacity as Sheriff of Tippecanoe County,  )  )  )  ) Defendant.  ) | Case No. 4:09-CV-6 JD |

## OPINION AND ORDER

This matter is before the Court on a Motion for Judgment on the Pleadings filed by the Defendant Tracy Brown, Sheriff of Tippecanoe County. Sheriff Brown originally filed this motion in March 2009, *see* DE 19, and Judge Allen Sharp granted the motion in a June 22, 2009 Memorandum Opinion and Order, holding that the case was moot because the putative class representative, Jeffrey Mark Olson, was no longer an inmate. The Seventh Circuit subsequently reversed that decision in *Olson v. Brown*, 594 F.3d 577, 584 (7th Cir. 2010),[1] and this case was later reassigned to the undersigned. The parties submitted new briefs on this motion at the Court's request. *See* DE 61, 62.

Sheriff Brown asked the Court to rule on this motion before ruling on the Motion for Class Certification, while Mr. Olson wanted it the other way around (or simultaneous rulings). In its recent ruling granting the motion to certify the class, the Court noted that it

> has resolved to determine, first, whether class certification is proper, and second, whether a judgment on the pleadings is proper, consistent with the directives of the

---

[1]The motion was characterized on appeal as a motion to dismiss, *Olson*, 594 F.3d at 584, but the parties' supplemental briefs confirm that the motion is in fact one for judgment on the pleadings.

> United States Supreme Court and the Seventh Circuit. *See Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 177 (1974); *Thomas v. City of Peoria,* 580 F.3d 633, 635 (7th Cir. 2009) ("First ruling on the merits of the federal claims, and then denying class certification on the basis of that ruling, puts the cart before the horse.") (collecting cases). Employing this process further comports with the Seventh Circuit's conclusion that "this case would be moot if Olson had brought his claims individually . . . [because he] sought injunctive relief and is no longer subject to the conditions that formed the basis of his complaint." *Olson v. Brown*, 594 F.3d 577, 580 (7th Cir. 2010). "If the district court certifies the class, the case can proceed to the merits for the certified class of plaintiffs." *Id*. at 584.

*See* DE 69 at 1–2. Having resolved the motion for class certification, the Court now turns to the motion for judgment on the pleadings.

## I. BACKGROUND

On January 2, 2009, Mr. Olson filed a "verified class action complaint for declaratory and injunctive relief" pursuant to 42 U.S.C. § 1983 and Indiana law, against Sheriff Brown in his official capacity, seeking to enjoin the practices of the Tippecanoe County Jail. *See* DE 1. Mr. Olson sued on his behalf[2] and on behalf of "any and all persons currently confined, or who will in the future be confined, in the Tippecanoe County Jail," *see* DE 1 at ¶ 6, although this Court found it appropriate to certify a more limited subclass of prisoners for some claims. The complaint alleges four areas in which the jail is violating the Indiana county jail standards promulgated by the Indiana Department of Corrections pursuant to Indiana Code § 11-12-4-2: (1) inadequate grievance procedures in violation 210 I.A.C. 3-1-15(h); (2) inadequate law library

---

[2]Mr. Olson's standing to initially sue is uncontested. Mr. Olson satisfied each of the Article III requirements for standing to sue by alleging an actual "injury in fact" that is concrete and particularized and is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable decision. *Arreola v. Godinez*, 546 F.3d 788, 794-95 (7th Cir. 2008) (stating that "it is best to confine the term 'standing' to the Article III inquiry and thus to keep it separate from the plaintiff's entitlement to relief or [the plaintiff's] ability to satisfy the Rule 23 criteria."). Mr. Olson had standing when he filed the complaint seeking injunctive relief where he was incarcerated in TCJ experiencing the alleged unlawful actions of the defendant.

access in violation of 210 I.A.C. 3-1-15(a); (3) opening of mail from the courts outside of an inmate's presence in violation of 210 I.A.C. 3-1-16(c); and (4) opening of mail from legal organizations and attorneys outside of an inmate's presence also in violation of 210 I.A.C. 3-1-16(c). *See* DE 60 at 2-3. The complaint also alleges that the handling of court and legal mail violates the First and Fourteenth Amendments to the United States Constitution.  On January 20, 2009, Sheriff Brown removed the case from Tippecanoe County State Court to this Court based upon federal question jurisdiction and supplemental jurisdiction. *See* DE 4.

By way of background, Mr. Olson was sentenced on or about November 1, 2003, to ten years in the Indiana Department of Corrections.  While pending transfer to a different facility, he was held at the Tippecanoe County Jail from August 29, 2008 to January 15, 2009.[3] *See* DE 60 at 2.  While incarcerated at the jail, he received mail correspondence both from various courts and attorneys which was opened by jail staff outside of his presence, even though the outside of each envelope was marked either with the return address of a court or with the phrase "legal mail." *See* DE 1 at ¶¶ 14, 16, 18-19.  Mr. Olson submitted grievances to jail staff following incidences occurring on September 8 and October 17, 2008, in which envelopes from court were opened outside of his presence that contained documents involving lawsuits in which Mr. Olson was representing himself. *See* DE 1 at ¶¶ 15, 17; DE 1-2 at p. 1, 3. When the jail staff did not respond to either grievance, Mr. Olson filed grievances concerning the failure to respond and appealed the original grievances. *See* DE 1 at ¶¶ 15, 17; DE 1-2 at p. 2, 4. The jail never

---

[3]Although Mr. Olson was transferred from jail, the Seventh Circuit has determined that the inherently transitory exception to the mootness doctrine prevented dismissal of this case, and remanded the case for consideration of the pending motion for class certification. *Olson v. Brown*, 594 F.3d 577 (7th Cir. 2010). Having certified the class, the Court holds that Mr. Olson's transfer does not moot the class claims.

responded to Mr. Olson's grievances. *Id.*

On September 18, 2008, Mr. Olson requested that he be permitted to visit the law library in order to conduct legal research concerning pending legal proceedings for which he was representing himself . *See* DE 1 at ¶ 20. Mr. Olson's request was denied, and despite subsequent requests to visit the law library, he was never permitted to do so. *Id.* On September 18, Mr. Olson submitted a grievance concerning his not being given access to the law library. *See* DE 1 at ¶ 21; DE 1-2 at p. 5]. The jail staff did not respond, and Mr. Olson submitted a grievance concerning the failure to respond and he appealed the original grievance [DE 1 at ¶ 21; DE 1-2 at p. 6]. No response was given. *Id.*

According to the complaint, Mr. Olson submitted at least twenty-one grievances and grievance appeals to the jail staff between his arrival at the jail on August 29, 2008, and the filing of the complaint. *See* DE 1 at ¶ 22. The jail never responded to any of them. *Id*. Mr. Olson filed grievances over the conduct which he opposes,[4] and maintained a journal recounting the precise language of each grievance and each grievance appeal. *See* DE 1 at ¶ 12. Moreover, on October 25, 2008, Mr. Olson submitted a grievance to the jail staff concerning the failure to respond to grievances. *See* DE 1 at  ¶ 23; DE 1-2 at p. 7. The jail staff did not respond to this grievance, and on November 7, 2008, Mr. Olson submitted an appeal of the grievance that received no response. *See* DE 1 at ¶ 23; DE 8. Once again, the jail did not respond to the grievance. *Id.*

The repeated lack of response to grievances and appealed grievances occurred, despite

---

[4]Sheriff Brown asserts that there is no indication that Mr. Olson filed a grievance specifically complaining that mail sent to him from an attorney was opened outside of his presence [DE 61-1], although Mr. Olson did complain that legal mail procedures where not being complied with by TCJ.

4

the fact that the jail employs a grievance policy to address inmate concerns [DE 1 at ¶ 13]. Once an inmate files a grievance, the jail is responsible for responding to the grievance within seven days. *Id*. If the inmate does not agree with the decision, he or she may appeal the decision. *Id*. The jail then has fifteen days to respond to the appeal. *Id*. According to the complaint, the failure to respond to grievances, the denial of law library access and the opening of legal mail were not isolated problems unique to Mr. Olson but emblematic of policies or practices of the county jail that violate the Indiana jail standards.

## II.    DISCUSSION

### A.    Standard of Review

The Court reviews a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), the same standard that applies to motions to dismiss under Rule 12(b)(6). *See R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). The Court will only grant a Rule 12(c) motion when, after accepting facts alleged in the complaint as true and viewing them in the light most favorable to the non-moving party, "it appears beyond a doubt that the plaintiff cannot prove any facts to support a claim for relief." *Guise v. BWM Mortg., LLC*, 377 F.3d 795, 798 (7th Cir. 2004). There are, however, some limits to the factual allegations the Court may accept as true: there must be sufficient facts plead to provide notice to the defendants of the claims; the facts must not be "so sketchy and implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim"; and the Court "should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (outlining pleading requirements after *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009)).

**B.      Federal Constitutional Claims**

In its previous order certifying this case as a class action, the Court outlined the federal legal theories at play in this case and certified a class action for claims that the prison mail-handling policy violates the free speech rights of the entire class (with respect to all "legal mail" including court mail) and the right to access the courts of a subclass comprised of only those prisoners who have now or may in the future have non-frivolous legal claims (solely with respect to attorney mail). Regarding the First Amendment claim, "[t]he Supreme Court has recognized that prisoners do have protected First Amendment interests in both sending and receiving mail." *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999) (citing *Thornburgh v. Abott*, 490 U.S. 401 (1989) and *Turner v. Safley*, 482 U.S. 78 (1987)). This is true for both legal and non-legal mail. *Id.* These rights, however, are subject to curtailments "reasonably related to legitimate penological interests." *Id.* (citing *Thornburgh*, 490 U.S. at 409). In the case of non-legal mail, it is firmly established that "prison security 'is a sufficient important governmental interest to justify limitations on a prisoner's first amendment rights,'" and that prison officials may therefore inspect incoming or outgoing non-legal mail for contraband. *Id.* (quoting *Gaines v. Lane*, 790 F.2d 1299, 1304 (7th Cir. 1986).

While Courts have also routinely approved of prison officials opening even prisoners' legal mail, they have been more solicitous of protections for such mail, indicating that the prisoner should be present when the letter is opened to ensure that a confidential letter is not read by the prison staff. *See Wolff v. McDonnell*, 418 U.S. 570, 576–77 (1974); *Guarjardo-Palma v. Martinson*, 622 F.3d 801, 804 (7th Cir. 2010) (collecting cases). Courts do not, however, always agree on what rights drive the heightened concern. Most have acknowledged that reading confidential mail from an prisoner's attorney at least potentially violates the prisoner's right to

meaningful access to the courts because "'the opportunity to communicate privately with an attorney is an important part of that meaningful access.'" *Guarjardo-Palma*, 622 F.3d at 802 (quoting *Dreher v. Sielaff*, 636 F.2d 1141, 1143 (7th Cir. 1980)).

Some courts have also located the special protections for legal mail in the prisoner's right to free speech. *See, e.g.*, *Jones v. Brown*, 461 F.3d 353, 359 (3d. Cir. 2006) ("A state pattern and practice, or, as is the case here, explicit policy, of opening legal mail outside the presence of the addressee inmate interferes with protected communications, strips those protected communications of their confidentiality, and accordingly impinges upon the inmates right to freedom of speech."). In *Denius v. Dunlap*, 209 F.3d 944 (7th Cir. 2000), the Seventh Circuit also described "the right to hire and consult an attorney," in terms of the First Amendment's protection for freedom of speech: "If by compelling an individual to reveal information that he would rather keep confidential the state chills the individual's ability to engage in protected speech, the state has infringed the individual's First Amendment right in the protected speech, unless it provides a sufficient justification for the required disclosure." *Id.* at 953–54. *Denius*, however, involved the rights of a teacher at a state-run program for high school dropouts, *id.* at 948, not inmates in a county jail, so it does not answer the question of whether heightened free speech protections for attorney-client communications necessitate greater restrictions on prisons' ability to inspect legal mail.

In *Guarjardo-Palma*, the Seventh Circuit reasoned the right of access to the courts, not the right to free speech, was the appropriate basis for heightened protections for attorney-client communication in the prison context because "the purpose of confidential communication with one's lawyer is to win a case rather than to enrich the marketplace of ideas." 622 F.3d at 802.The right of access to the courts, however, brings with it additional considerations and hurdles that do

not burden the right to free speech. In the related context of adequate prison libraries and legal assistance programs, the Supreme Court held in *Lewis v. Casey*, 518 U.S. 343 (1996), that "[i]nsofar as the right vindicated by [*Bounds v. Smith*, 430 U.S. 817 (1977),] is concerned, 'meaningful access to the courts is the touchstone, and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in [a] library or legal assistance program *hindered his efforts to pursue a legal claim*." *Id.* at 351 (emphasis added). The Seventh Circuit has confirmed that *Lewis* informs mail-handling claims as well: "there must likewise by [sic] a showing of hindrance in a claim of interference with a prisoner's communications with his lawyer." *Guarjardo-Palma*, 622 F.3d at 805; *see also Kaufman v. McCaughtry*, 419 F.3d 678, 686 (7th Cir. 2005) ("[W]hen a prison receives a letter for an inmate that is marked with an attorney's name and a warning that the letter is legal mail, official's *potentially* violate the inmate's rights if they open the letter outside of the inmates presence." (emphasis added)).

To make out a claim that a prison is denying him his right of access to court and enjoin the prisons actions, therefore, a prisoner must allege that he has a non-frivolous legal claim that he wishes to pursue and that the challenged prison conduct is actually hindering that claim. Where the interference with the confidentiality of attorney-client communications is isolated, such hindrance may be difficult to prove because the "effect on prisoners' access to justice is likely to be nil." *Guarjardo-Palma*, 622 F.3d at 805. But *Guarjardo-Palma* also noted that "proof of a *practice* of reading a prisoner's correspondence with his lawyer should ordinarily be sufficient to demonstrate hindrance." *Id.* at 805. This is because a prisoner's knowledge of such a practice (whether or not it was ever employed on his own mail) "will to a high probability reduce the candor of those communications." *Id.*

Turning to the case at hand, the Court notes that the plaintiffs' claim regarding the

handling of attorney-client mail is not actionable as a free speech claim, for the reasons discussed above. It is well-established that security interests permit prison officials to inspect incoming and outgoing mail from prisoners without infringing their right to free speech. *Rowe*, 196 F.3d at 782. Moreover, in the Seventh Circuit at least, legal mail—including confidential communications with attorneys—is not distinct from non-legal mail as far as *free speech rights* are concerned. *See Gaurjado-Palma*, 622 F.3d at 802..

As an access to court claim, however, the plaintiffs' case fares much better. First, Mr. Olson's complaint plainly alleges that he had a pending civil lawsuit in the Eastern District of Kentucky at the time his legal mail "from various attorneys" including the ACLU of Indiana, was allegedly opened outside of his presence and it is not unreasonable to infer from these allegations that these attorneys represented him either in then pending or potential claims (such as this one),[5] such that a hindrance in his ability to communicate confidentially with his attorney could have actually injured his right to access the courts. Second, he alleges that the prison's handling of his mail from attorneys was part of a "practice or policy of opening and reading clearly identifiable legal mail, including legal mail from the ACLU of Indiana, outside of the presence of the inmate to whom the mail is addressed." DE 1 ¶26. Under the access to courts legal theory explained in *Guarjardo-Palma*, these allegations are sufficient to state a claim that, with respect to clearly marked legal mail from attorneys, the prison has a mail-handling policy that was hindering the plaintiffs' efforts to pursue one or more non-frivolous claims at the time

---

[5]Mr. Olson does not specifically allege that the mail from the ACLU of Indiana that was opened outside of his presence related to this case, but he does suggest that the Court should make the connection on its own. The Court agrees. It is a matter of record that Mr. Olson *is* represented by the ACLU and it is therefore a reasonable assumption—all that is required at this stage of the proceedings—that the mail from the ACLU was in fact privileged attorney-client correspondence.

9

Mr. Olson filed his complaint. The Court will therefore deny Sheriff Brown's motion with respect to the federal access to courts claim.

The Court is aware that this leaves Mr. Olson and the class with no remaining claim that the jail's policy of opening court mail outside the presence of addressee's violates the inmates' federal constitutional rights. As the Court noted in its order of class certification, the Seventh Circuit has expressed scepticism concerning special protections for court mail in cases such as *Guarjardo-Palma* and *Martin v. Brewer*, 830 F.2d 76 (7th Cir. 1987). Mr. Olson contends, however, that in *Castillo v. Cook County Mail Room Dep't*, 990 F.2d 304, 306–07 (7th Cir. 1993), the court previously held that a complaint that alleged only that jail officials had opened two letters from a federal district court and one letter from the Department of Justice stated a claim upon which relief could be granted and that "this is conclusive of the issue" of whether some court mail is entitled to special protections under the federal constitution.

Mr. Olson's reliance on *Castillo* is weakened by legal developments since that case was decided. First, *Castillo* was decided under a previous version of 28 U.S.C. § 1915 that permitted district courts to dismiss *in forma pauperis* filings only when the action was "frivolous or malicious," or, in other words, it "lack[ed] an arguable basis in law or in fact." *Castillo*, 990 F.2d at 306 (quoting *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Under that low standard, "a complaint filed *in forma pauperis* which fail[ed] to state a claim under Federal Rule of Civil Procedure 12(b)(6) may nonetheless have 'an arguable basis in law' precluding dismissal under § 1915(d)." *Id.* (quoting *Denton v. Hernandez*, 504 U.S. 25, 31–32 (1992)). Thus, *Castillo* did *not* hold that allegations of interference with court mail state a claim, but merely that such allegations were not made frivolous by the court's previous non-binding pronouncements. Second, *Castillo* was decided before the Supreme Court decided *Lewis v. Casey* and changed the

10

landscape for access to court claims, including claims arising from mail-handling policies, by requiring claimants to allege some hindrance to an actual or imminent case. Third, *Castillo* did not specify whether the plaintiff's "arguable basis" lay in a theory of free speech or access to court—given the very low standard, it would not have been necessary—but as the Court has already explained, the Seventh Circuit has since then decided that any supplemental protection for legal mail arises from the right to access to court, not from the freedom of speech. *See Guarjardo-Palma*, 622 F.3d at 802. For these reasons, *Castillo* cannot bear the weight that Mr. Olson puts on it, and the Court must be guided by the Seventh Circuit's more recent and fully reasoned decisions.

Finally, the Court notes that it does not reach the question of whether Mr. Olson's complaint states a claim that the policy of opening court mail impedes his right to access to court. The Court discussed that claim in its order of class certification and concluded that class certification was not appropriate for that claim, primarily because it found that Mr. Olson was not a proper representative as his claim was not typical of the class claims because he failed to allege "hindrance". The Court then dismissed that claim as moot because Mr. Olson was long ago transferred out of the Tippecanoe County Jail and therefore no longer has standing to seek injunctive relief on his own behalf, divorced from the class he sought to represent.

**C.      State law claims**

The plaintiffs also seek to enforce certain jail standard requirements found in the Indiana Administrative Code, specifically those addressing law library access, 210 Ind. Admin. Code § 3-1-15(a), grievance procedures, *id.* § 3-1-15(h), and mail handling procedures, *id.* § 3-1-16(c). The threshold question on these claims—and ultimately the dispositive issue—is whether the plaintiffs have a private right of action to enforce these standards.

The parties agree that Indiana law does not explicitly provide a private cause of action to enforce the Indiana Jail Standards that the Tippecanoe County Jail has allegedly violated. The Chapter under which the county jail standards were promulgated says nothing about private enforcement actions against counties for violations of the standards. But it is not altogether silent on the issue of remedies for failures to comply with the jail standards. Under Indiana Code § 11-12-4-2, the Department of Corrections must inspect each county jail annually to determine compliance with the county jail standards. If the department provides notice of a lack of compliance, the county sheriff "may bring an action in the circuit court against the board of county commissioners or county council for appropriate mandatory or injunctive relief." *Id.* § 11-12-4-2(c). If "the county is not making a good faith effort toward compliance" within six months of the notice, the department may take direct action by "petition[ing] the circuit court for an injunction prohibiting the confinement of persons in all or any part of the jail, or otherwise restricting the use of the jail" or recommending "that a grand jury be convened to tour and examine the county jail." *Id.* § 11-12-4-2(b).

Under Indiana law, this comprehensive enforcement mechanism appears to prohibit the Court from finding an additional remedy in the form of an implied private cause of action. "[W]hen legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." *Coons v. Kaiser*, 567 N.E.2d 851, 852 (Ind. App. 1991). This is so because "[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *Id.* (quoting *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers*, 414 U.S. 453, 459 (1974)); *see also Malone v. Becher*, No. NA 01-101-C H/H, 2003 WL 22080737 (S.D. Ind., Aug. 29, 2003) (collecting cases). In this case, moreover, allowing a private cause of action could substantially

12

undermine the careful enforcement mechanism chosen by the Indiana legislature: rather than a gradual process involving all of the key institutional players responsible for overseeing county jails, a private right of action would see individual prisoners or groups of prisoners attempting to enforce their own visions of what compliance with the jail standards should look like.

The Court is not aware of any Indiana state court decisions specifically considering whether prisoners have a private cause of action to enforce the county jail standards, but every federal decision on point supports the Court's reasoning above. First, in *Malone v. Becher*, No. NA 01-101-C H/H, 2003 WL 22080737 (S.D. Ind., Aug. 29, 2003), then-Southern District of Indiana Judge Hamilton rejected a class-action claim for damages based on the Clark County Jail's alleged violations of the Indiana jail standards—in that case, provisions requiring that clean clothing be provided weekly and that each inmate have the opportunity to shower three times a week. The court looked to the Indiana Code, rather than the jail standards, for an express or implied cause of action, noting that "as a general rule, a state's administrative regulations do not provide the source of an implied cause of action for damages against a local government." *Id.* at *20. It then cited *Coons* for the rule that a statute's specification of one or more remedies prohibits judicial implication of other, non-specified remedies and concluded that because the Indiana legislature had provided a specific remedy in Indiana Code § 11-12-4-2, "[n]othing in the statute suggests that the legislature intended to give inmates or anyone else a private cause of action for damages, and the court sees no basis for implying one." *Id.* at *20.

Then, in *Tyson v. Grant County Sheriff*, No. 1:07-CV-0010, 2007 WL 1395563 (N.D. Ind., May 9, 2007), a court in this district reached a similar conclusion with respect to class-action claims seeking declaratory and injunctive relief to remedy alleged violations of several statutory provisions as well as jail standards requiring one bed for each prisoner, sanitary

13

conditions, and a reasonable opportunity for physical exercise for inmates. Judge Lozano agreed with *Malone* that the remedy provided in Indiana Code § 11-12-4-2 precluded an implied private cause of action. *Tyson*, 2007 WL 1395563 at *9.

Turning to the alleged statutory violations, the court dug deeper into Indiana case law to uncover a broader presumption against implied causes of action in the prison context. *Id.* at *10. Judge Lozano first discussed *Blanck v. Indiana Dept. of Corrections*, 829 N.E.2d 505 (Ind. 2005), in which the Indiana Supreme Court reaffirmed earlier holdings that prison disciplinary decisions by the Indiana Department of Corrections were not subject to judicial review under an implied cause of action. *Id.* at 510. In that case, the Indiana Supreme Court found that the Indiana legislature clearly intended to preclude judicial review when it established an exclusive means for judicial review of agency actions in the Indiana Administrative Orders and Procedures Act and then excluded Department of Correction's decisions with respect to prisoners from judicial review. *Id.* Judge Lozano then followed this stream of precedent to the Indiana Court of Appeals decision in *Kimrey v. Donahue*, 861 N.E.2d 379 (Ind. Ct. App. 2007), where that court held that *Blanck* was not limited to prison disciplinary cases but rather created a presumption against judicial review of prisoner complaints generally: "We garner from the *Blanck* decision that trial courts lack subject matter jurisdiction over such complaints unless an explicit private right of action is afforded by statute or the allegation is made that constitutional rights are being violated." *Id.* at 382.

Finally, in *Kress v. CCA of Tennessee, LLC*, No. 1:08-cv-00431, 2011 WL 1323680 (S.D. Ind., Apr. 13, 2011), Judge McKinney of the Southern District relied heavily on *Malone* and *Tyson* to deny a plaintiff class a private right of action for injunctive relief. In that case, the defendant was a privately run correctional facility, rather than a county jail, and the plaintiffs

alleged the prison conditions violated the Indiana jail standards as well as the Eighth and Fourteenth Amendments of the United States Constitution. *Id.* at *1. With respect to the jail standards, the plaintiffs sought to distinguish *Malone,* arguing that it dealt only with money damages, and *Tyson*, arguing that it did not apply when a sheriff had contracted out oversight of a facility to a private company. *Id.* at *9. The court found both distinctions inconsequential and agreed with the earlier cases that because Indiana Code § 11-12-4-2 entrusts enforcement of the jail standards to the county sheriff and Commissioner of the Department of Corrections, prisoners have no private right of action to enforce the jail standards themselves. *Id.*

Against this considerable array of authority, the plaintiffs advance an alternative, much more generous approach to implying a private cause of action. Quoting *Bailey v. Washington Theater Co.*, 34 N.E.2d 17, 19 (Ind. 1941), they claim that any statute that imposes a duty for an individual's benefit must be read to include a private cause of action unless the "statute in addition to imposing the duty provides a specific remedy for the person aggrieved by its violation and fixes the maximum amount recoverable by such aggrieved person[]." According to the plaintiffs, this principle applies equally to administrative regulations because "[p]roperly adopted administrative rules and regulations have the force and effect of law." *See* DE 62 at 8 (quoting *Hopkins v. Tipton County Health Dep't*, 769 N.E.2d 604, 608 (Ind. Ct. App. 2002)). Following this approach, the plaintiffs distinguish the state court decision in *Blanck* and *Kimrey* because those cases involved prisoners within the Department of Corrections who sought judicial review for violations, such as disciplinary decisions and the withholding of printed matter, that could be redressed through the department's grievance procedure. With regard to Judge Lozano's decision in *Tyson*, the plaintiffs explain that its holding is "suspect" because it "did not address the clear rules set down by the Indiana Supreme Court in *Bailey*," and that the real

15

reason that the jail standards in *Tyson* were unenforceable was that they "rely on inherently malleable terms."

Plaintiffs' entire edifice is built on shaky foundations. It is quite understandable that Judge Lozano did not address the "clear rules set down by the Indiana Supreme Court in *Bailey*": neither *Blanck*, *Kimrey*, nor *one single case* in the seventy-plus years since *Bailey* was decided have cited the case for its "clear rules." Regardless, this Court has examined *Bailey* and finds that it cannot bear the weight that the plaintiffs put on it. That case merely held that where a statute provided a specific remedy for the person aggrieved by the violation of a statutory duty, the court could not permit a greater recovery. But the inverse—that in the absence of a specific statutory remedy for the person aggrieved a court must imply one—does not logically follow and was not suggested by the court. Moreover, even if *Bailey* did create a rule for *statutory* duties, the plaintiffs point to no authority for their contention the same rule applies to administrative regulations, contrary to the general rule that "a state's administrative regulations do not provide the source of an implied cause of action." *See Malone*, 2003 WL 22080737, at *20. The cases the plaintiffs cite stand simply for the uncontroverted proposition that regulations have the force of law and must be obeyed and do not suggest that agencies, as a general matter, have the authority to confer subject matter jurisdiction on courts by implying a private right of action.

The plaintiffs' arguments are thus unavailing in the face of persuasive precedent from this district and the Southern District of Indiana, as well as the reasoning of the Indiana courts in *Blanck* and especially *Kimrey*. The Court agrees with *Tyson*, *Malone*, and *Kress*, that prisoners do not have a private cause of action to enforce the Indiana county jail standards promulgated under Indiana Code § 11-12-4-2. The state law claims must be dismissed.

### III.   CONCLUSION

Accordingly, the Court concludes that the class plaintiffs' have stated a claim that the Tippecanoe County Jail has a policy of opening mail to attorneys outside the addressee prisoner's presence, and that this policy violates the class members' right to access to court by hindering confidential communications with attorneys regarding non-frivolous legal claims. Under Seventh Circuit precedent, however, the plaintiffs are not entitled to relief on their claim that the jail's legal-mail handling policy violates the class members' freedom of speech. Further, the plaintiffs' state law claims must be dismissed because there is no express or implied cause of action for violations of the Indiana jail standards promulgated under Indiana Code § 11-12-4-2. For these reasons, explained more fully above, the Court **GRANTS IN PART AND DENIES IN PART** the Defendant's motion for judgment on the pleadings [DE 19].

SO ORDERED.

ENTERED:  July 25, 2012

/s/ JON E. DEGUILIO
Judge
United States District Court